UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

IRIS BITON,

                           Plaintiff,

     -against-

THE CITY OF NEW YORK, SERGEANT
IAN NADEL (Shield No.:  00580), formerly of
the 66th Precinct, in his individual and official
capacities, and POLICE OFFICER LATISHA
LATISHA WRIGHT, formerly of the 66th Precinct,
in her individual and official capacities, ,

                          Defendants.

--------------------------------------------------------------x

Docket No.: 17-CV-3981 (LDH)(JO)

**AMENDED
COMPLAINT**

**DEMAND FOR JURY
TRIAL**

Plaintiff IRIS BITON, through her attorney, Kathy A. Polias, Attorney-at-Law,

complaining of the Defendants THE CITY OF NEW YORK, SERGEANT IAN NADEL (Shield

No.:  00580) formerly of the 66th Precinct, in his individual and official capacities, and POLICE

OFFICER LATISHA WRIGHT, formerly of the 66th Precinct, in her individual and official

capacities, respectfully alleges as follows:

## NATURE OF ACTION

1.    This action is brought to remedy Defendants Sergeant Ian Nadel's and Police

Officer Latisha Wright's charging of Plaintiff with crimes and offenses and malicious

prosecution of Plaintiff, without probable or reasonable cause, while acting under color of state

law, in violation of 42 U.S.C. Sec. 1983 and the Fourth, Fifth, and Fourteenth Amendments to

the U.S. Constitution, and pursuant to policies, practices, and customs of Defendant City of New

York.

## JURISDICTION AND VENUE

2.      Jurisdiction is specifically conferred upon this Court by 42 U.S.C. Sec. 1983 and by the U.S. Constitution.

3.      Venue is proper because the incidents complained of in this lawsuit occurred in Brooklyn, New York, which is within the Eastern District of New York.

## PARTIES

4.      During all times relevant and material to this Complaint, Plaintiff Iris Biton was a resident of the State of New York within the jurisdiction of this Court.

5.      During all times relevant and material to this Complaint, Defendant City of New York was a municipal corporation organized under the laws of the State of New York and with its principal place of business at 100 Church Street, New York, NY 10007.

6.      During all or some of the times relevant and material to this Complaint, Defendant Sergeant Ian Nadel was employed by Defendant City of New York in the New York City Police Department and assigned to the 66th Precinct at 5822 16th Avenue, Brooklyn, NY 11204.

7.      During all or some of the times relevant and material to this Complaint, Defendant Police Officer Latisha Wright was employed by Defendant City of New York in the New York City Police Department and assigned to the 66th Precinct at 5822 16th Avenue, Brooklyn, NY 11204.

## STATEMENT OF FACTS

8.      On April 9, 2013, Plaintiff Iris Biton was living with her daughter, Jessica Francis, and Plaintiff's three grandchildren, aged 11, 10, and 5 years old, at 1335 East 5th Street, Brooklyn NY 11230.

2

9.      On the morning of April 9, 2013, at around 9:00 a.m., Plaintiff left the house and went up the block to get coffee. As she was walking back to the house, she saw a commotion in front of the house. Plaintiff saw the landlady of 1335 East 5th Street, Judith Blumenthal[1], grabbing at Plaintiff's daughter Jessica Francis. Jessica Francis's three children/Plaintiff's grandchildren and their two cousins aged 4 and 8 years old, were standing nearby. Plaintiff also saw about twenty to thirty people gawking at them and a man named Michael Mischel, who lived across the street, yelling at Ms. Blumenthal to leave Ms. Francis alone.

10.     Plaintiff was attempting to call 911 when she heard police sirens. Judith Blumenthal let go of Jessica Francis. At least one police vehicle arrived on the scene.

11.     Plaintiff first saw a Black female officer, whom upon Plaintiff's information and belief, was one Police Officer Avril. The female Officer stated that she was going to have to arrest both Judith Blumenthal and Jessica Francis. Plaintiff asked the officer to please not arrest them. The officer responded that she had to arrest them, that it was her job.

12.     However, the officer did not arrest them at that time. Plaintiff soon lost sight of this officer. Plaintiff was standing next to her daughter and the five children, and a few minutes after Plaintiff lost sight of the Black female officer, Defendant Police Officer Latisha Wright approached Plaintiff and her daughter, Jessica Francis. Defendant Police Officer Wright escorted Plaintiff and Ms. Francis, along with the five children, first off to the side and then across the street from the residence. One of the first statements that Police Officer Wright made to Plaintiff was to tell her to take the children, who included Plaintiff's grandchildren, to school. Plaintiff responded that she would love to but that her grandchildren didn't want to leave their mother.

---

[1] Judith Blumenthal had been trying to evict Jessica Francis and Iris Biton from the apartment.

13.     Defendant Police Officer Wright asked Jessica Francis what happened.  Jessica Francis explained that she was about to take her children to school when Ms. Blumenthal started videotaping her.  Jessica Francis explained that she said to Ms. Blumenthal to please leave her alone and that Ms. Blumenthal grabbed her.  Jessica Francis had a long scratch on her arm and she was bleeding from the scratch.

14.     As Plaintiff and Jessica Francis were standing with Defendant Police Officer Wright, Plaintiff noticed that several police cars had arrived on the scene and that there were about six to seven police officers with Ms. Blumenthal.  Plaintiff asked Defendant Officer Wright why there were so many officers with Ms. Blumenthal and Officer Wright was the only one with Plaintiff and Ms. Francis.  Defendant Officer Wright did not respond.

15.     At one point, Defendant Sergeant Ian Nadel passed by Plaintiff, Jessica Francis, and Defendant Officer Wright.  Plaintiff recognized him as someone with authority.  Plaintiff asked him why no one was speaking with her daughter and stated that her daughter was the one who was the victim, that she was injured, and that she had blood on her arm.  Defendant Sergeant Nadel ignored Plaintiff.  Defendant Officer Wright told Plaintiff that that was her Field Sergeant and not to talk to him.

16.     After Plaintiff and Jessica Francis were standing with Defendant Officer Wright for about twenty minutes, Plaintiff said she was going to go ahead and take the children to school.  Defendant Sergeant Nadel happened to be within earshot when Plaintiff made that statement and he yelled that she was not taking them to school.  Plaintiff asked why and said that she is the grandmother, that she has permission to take the children, and that she takes them all the time.  Defendant Sergeant Nadel said no, that someone else will take them.  He looked at Defendant Officer Wright and pointed to one of the Police vehicles.  Defendant Officer Wright

then arrested Plaintiff. She escorted Plaintiff to a police vehicle and placed Plaintiff in the back

seat of the vehicle. Upon Plaintiff's recollection, Plaintiff was handcuffed. As explained further

below, Defendants arrested Plaintiff without any probable or reasonable cause to believe that she

had committed a crime or offense.

17.     Plaintiff sat in the vehicle for about fifteen to twenty minutes, after which she

was driven by two Police Officers to the 66th Precinct. Plaintiff repeatedly asked the officers in

the vehicle why she had been arrested and she was not given an answer.

18.     At the Precinct, Plaintiff saw Defendant Sergeant Nadel and she told him that she

didn't belong there. In response, he threatened, "I'll put you in solitary!" His threat caused

Plaintiff a great deal of emotional and mental distress. Plaintiff was placed in a holding cell.

19.     Plaintiff asked Defendant Officer Wright at the Precinct why she had been

arrested and said she needed to use the bathroom and she needed to make a phone call.

Defendant Officer Wright's only response was that she would get to Plaintiff, that she had to do

paperwork.

20.     Shortly after Plaintiff was placed in the holding cell, her daughter Jessica Francis

joined her in the cell, as she had been arrested as well. Jessica Francis repeatedly asked her

mother, "Why are you here?" and "Why did they do this to you?" Jessica Francis also told

Plaintiff that Defendant Sergeant Nadel had told her (Jessica Francis) that he had seen her and

her mother for ten minutes and he did not like them either.

21.     On the paperwork for Plaintiff's arrest, Defendant Officer Wright, the arresting

officer, mostly reiterated the statements that she put on the paperwork for Jessica Francis's

arrest. Defendant Officer Wright indicated on both the Arrest Reports for Jessica Francis and

Plaintiff that the complaining victim (Judith Blumenthal) had reported that during a verbal

5

dispute with the respective individual, the respective individual did push the complaining victim, causing a laceration to the complaining victim's hand.

22.     Defendant Officer Wright, with the approval of Defendant Sergeant Nadel, charged Plaintiff with Assault in the Third Degree (violation of Penal Law 120.00), Disorderly Conduct (violation of Penal Law 240.20), and Endangering the Welfare of a Child (violation of Penal Law 260.10).  Neither Defendant Sergeant Nadel nor Defendant Police Officer had probable or reasonable cause to believe Plaintiff was guilty of any crime or offense or to believe that a prosecution against her could succeed.

23.     On or about the morning of April 10, 2013, after having been imprisoned for approximately 24 hours, Plaintiff was arraigned in Kings County Criminal Court in the criminal case, People of the State of New York v. Iris Biton, et al., Docket No.: 2013KN027226. Plaintiff was released on her own recognizance that morning.  She subsequently had to appear in Court many times before a bench trial commenced on May 21, 2014 and continued on May 28, 2014, May 30, 2014, June 12, 2014, June 13, 2014, June 14, 2014, June 23, 2014, and July 1, 2014.  Plaintiff was acquitted of all charges on July 1, 2014.

24.     As demonstrated by the following, Ms. Blumenthal did not make the allegations or complaints about Plaintiff that Defendants claimed that Ms. Blumenthal made before Defendants arrested, charged, and initiated process against Plaintiff.  Ms. Blumenthal did not make the allegations or complaints to Defendant Officer Wright, to Defendant Sergeant Ian Nadel, or to any other Police Officer, before Defendants arrested, charged, and initiated process against Plaintiff.  Therefore, Defendants did not have probable cause to charge and initiate process against Plaintiff, or to arrest and imprison Plaintiff.

6

25.     Firstly, as stated above, one of the first statements that Defendant Police Officer Wright made to Plaintiff after approaching her and Jessica Francis was to tell Plaintiff take the children to school.  In fact, Defendant Officer Wright later testified during the criminal trial on June 13, 2014 that Plaintiff refused to leave the scene and that she (Officer Wright) had asked Plaintiff several times to take the children and move them away from the scene.  The fact that Officer Wright told Plaintiff to leave the scene shows that Officer Wright did not believe there was reason to arrest or charge Plaintiff with a crime or offense.  When Defendant Police Wright alleged during her testimony in the criminal proceeding on June 13, 2014 that Ms. Blumenthal made complaints about Plaintiff and that these complaints formed the basis for the arrest and the charges against Plaintiff, Defendant Officer Wright conveyed that Ms. Blumenthal made these complaints directly to Defendant Officer Wright before Defendant Officer Wright arrested Plaintiff.  However, Defendant Officer Wright did not leave Plaintiff's and Jessica Francis's side between the time that Defendant Officer Wright told Plaintiff to leave the scene with Plaintiff's grandchildren and when Defendant Officer Wright arrested Plaintiff, so Defendant Officer Wright could not have received said information from Judith Blumenthal before she arrested Plaintiff.  Therefore, she did not have probable cause, and could not have had probable cause, to arrest Plaintiff or to charge Plaintiff with crimes.

26.     Secondly, Defendant Officer Wright was highly inconsistent about what Judith Blumenthal allegedly reported to her.  At trial, and months after arresting and charging Plaintiff, Defendant Officer Wright added allegations about what Judith Blumenthal reported to her at the scene that she did not include at all in the Arrest Report for Plaintiff or in her memo book.  Defendant Officer Wright claimed for the first time at trial that at the scene, Judith Blumenthal accused Plaintiff of damaging her camcorder.  In addition, several months after arresting and

charging Plaintiff, Defendant Officer Wright claimed in a statement to the Kings County District Attorney's Office that Judith Blumenthal had also accused Plaintiff of stealing her cell phone. Upon information and belief, Defendant Officer Wright's statement to the Kings County District Attorney's Office moved the District Attorney's Office to add larceny charges against Plaintiff. Defendant Officer Wright also testified at trial on June 13, 2014 that Judith Blumenthal accused Plaintiff at the scene of stealing her cell phone. When cross-examined by Jessica Francis's attorney as to why Defendant Officer Wright did not include the stolen cell phone in her memo book, Officer Wright incredulously claimed that Judith Blumenthal did not want to report her cell phone stolen and wanted to get information and confirmation from her rabbi.

27.     Thirdly, Defendant Officer Wright did not include any mention of Plaintiff on the Aided Report Worksheet for Judith Blumenthal; she only mentioned Jessica Francis. Officer Wright stated on the worksheet that Judith Blumenthal was a sick/injured person and that she refused medical aid. Officer Wright further stated on the report: "At T/P/O [Blumenthal] sustain[ed] a small laceration to her left hand after being pushed by her neighbor Francis, Jessica, D. Aided also complained of a headache after incident."

28.     As explained below in paragraphs 32, et seq., Defendants Police Officer Wright and Sergeant Ian Nadel were motivated to arrest and charge Plaintiff in violation of her Constitutional rights by policies, customs, and practices of the City of New York. Defendant Sergeant Nadel was also motivated by his dislike of Plaintiff and his desire to retaliate against her for exercising her First Amendment right to freedom of speech in the following ways. Plaintiff first asked Sergeant Nadel why none of the officers were speaking to her daughter, which, in essence, was a criticism of how the officers were conducting themselves. Then later, after Sergeant Nadel told Plaintiff that she couldn't take the children to school, she asked him

why she couldn't and asserted that she was their grandmother and that she had authority to do same, which, in essence, was a request that he justify his directive.

29.     Furthermore, even if Judith Blumenthal made the statements that Defendant Officer Wright attributed to her, which did not appear to happen, Defendant Officer Wright clearly had reason to doubt Judith Blumenthal's veracity because Defendant Officer Wright did not include several of the alleged statements in the arrest paperwork, such as that Plaintiff allegedly damaged her camcorder and stole her cell phone.  Furthermore, as stated above, Officer Wright did not mention Plaintiff in the Aided Report Worksheet.

30.     As a result of Defendants' actions, Plaintiff suffered severe emotional, mental, and physical distress, including but not limited to post-traumatic stress disorder.  She received therapy and had to pay fees for the therapy.

31.     In addition, Plaintiff lost a great deal of income because she could only work sporadically from April 2013 to July 2014 due to the stress caused by Defendants' actions and also because she had to appear in Court many times during business hours.  In addition, on the date that she was arrested, she was supposed to have a business meeting with a potential client that could have resulted in lucrative business opportunities in real estate and other areas and she was not able to attend the meeting because of the arrest.

32.     Upon information and belief, Defendants maliciously prosecuted Plaintiff to perfect the baseless arrest, which in turn was motivated by the need to meet productivity standards and de facto quotas in place in the New York City Police Department and the 66th Precinct.

33.     The imposition of arrest quotas on police officers by their superiors has long been a policy, practice, and/or custom in the New York City Police Department.  Numerous

publications have reported on the widespread implementation and enforcement of arrest quotas in the New York Police Department over the past decade and the many arrests and prosecutions without probable cause that have resulted from this policy, practice, and custom. Attached hereto as **Exhibit A** are various reports on this policy practice, and custom.

34.     Officers arresting and charging members of the public without a legitimate basis is a natural and plainly obvious consequence of expecting and pressuring officers to meet arrest quotas. The City of New York and the New York City Police Department have promulgated this policy, practice, and custom or have allowed the promulgation of this policy, practice, and custom. In doing same, they have exhibited deliberate indifference to members of the public's constitutional rights to be free from false arrest and malicious prosecution.

35.     Numerous police officers, including officers from the 66th Precinct, have complained about, protested, and/or documented this policy, practice, and custom in the New York City Police Department and have brought lawsuits against the City of New York and high-ranking officers for retaliating against them for doing same. For example:

(a)     On August 10, 2010, Police Officer Adrian Schoolcraft filed a federal action against the City of New York and other officers in the U.S. District Court, Eastern District of New York alleging that the defendants retaliated against him for his documentation and disclosure of a quota policy in the New York City Police Department for the issuance of summons and arrests, as well as other illegal practices. The action was Schoolcraft v. The City of New York, et al., Docket No.: 10-cv-4228 (RWS). Schoolcraft alleged that Defendants had retaliated against him by unlawfully entering his home and forcibly removing him in handcuffs, seizing his personal effects, and having him admitted to the hospital

under false information that he was emotionally disturbed.  The action ended with Plaintiff Schoolcraft accepting a Rule 68 Offer of Judgment by Defendants in the amount of $600,001.00 plus back pay and reasonable attorney's fees and costs.

(b)     On February 23, 2012, Police Officer Craig Matthews filed a federal action in the U.S. District Court, Southern District of New York against the City of New York and other officers alleging that he complained about the police department's use of an illegal quota system to successive precinct commanding officers in the 42nd Precinct and as a result, he was given punitive assignments, denied overtime pay and leave, given poor work evaluations, and threatened and harassed by fellow officers.  That action was <u>Matthews v. The City of New York, et al.</u>, Docket No.: 12-cv-1354 (PAE).   In 2015, the City of New York agreed to pay around $287,000.00 to settle the action.  Christopher Dunn, Associate Legal Director of the New York Civil Liberties Union who represented Officer Matthews in the action said in a statement to the *Huffington Post* on December 7, 2015:

> "Quota systems in the NYPD drove the explosion of unlawful stops and arrests during the [Michael] Bloomberg administration and seriously damaged police community relations…Officer Matthews was right to object to the quota system in his precinct, and this settlement establishes that police officers will be protected when they blow the whistle on unlawful NYPD policies."

(c)     On August 31, 2015, twelve police officers filed a class action against the City of New York and other officers in the U.S. District Court, Southern District of New York alleging that the NYPD maintains illegal arrest and citation quotas and that they were pressured to meet quotas and were subjected to adverse and retaliatory actions when they refused to enforce or complained about the quotas.  That action was <u>Raymond, et al. v. The City of New York, et al.</u>, 15-CV-6885.  The plaintiffs

included an officer in the 66th precinct named Police Officer Olayokun Olagoke. Although the amended complaint in that action was dismissed on March 6, 2017, the Court ordered that Plaintiff may make a motion to replead certain causes of action, which the Plaintiffs did on April 7, 2017.  That motion has not been decided yet.

(d)     On December 14, 2016, Police Officer Michele Hernandez filed the following action in the United States District Court, Southern District of New York against the City of New York and other officers alleging that she was subjected to a campaign of retaliation and harassment for complaining about being forced to implement illegal arrest quotas guised as "performance goals":  Hernandez v. The City of New York, Docket No.: 16-CV-9662 (JGK).  Among other things, she alleged that she was threatened with suspension, harassment, and other adverse employment actions.  The case is still pending.

## AS FOR A FIRST CAUSE OF ACTION

36.     Plaintiff repeats and realleges paragraphs 1 through 35 as if each is set forth herein.

37.     In violation of 42 U.S.C. Sec. 1983, Defendants Police Officer Wright and Sergeant Nadel, while acting under color of State Law, maliciously prosecuted Plaintiff by charging Plaintiff with crimes and offenses and initiating legal process against Plaintiff without probable or reasonable cause to believe that she had committed crimes and offenses or that a prosecution against her would succeed.  Defendants, while acting under color of state law, thereby violated Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution to be free of malicious prosecution. The criminal case against Plaintiff was terminated in her favor on July 1, 2014, as Plaintiff was

acquitted of all charges.  Defendants' actions were malicious, wanton, gross, and with reckless disregard of Plaintiff's rights.

## AND AS FOR A SECOND CAUSE OF ACTION

38.     Plaintiff repeats and re-alleges paragraphs 1 through 37 as if each is set forth herein.

39.     The individual Defendants' violations of Plaintiff's constitutional/federal rights in the First Cause of Action were perpetrated pursuant to a policy, practice, and custom in the City of New York and the New York City Police Department that officers meet arrest quotas. Officers arresting and charging members of the public without a legitimate basis is a natural and plainly obvious consequence of expecting and pressuring officers to meet arrest quotas.  The City of New York and the New York City Police Department have promulgated this policy, practice, and custom or have allowed the promulgation of this policy, practice, and custom.  In doing same, they have exhibited deliberate indifference to members of the public's constitutional rights to be free from false arrest and malicious prosecution.

40.     Therefore, Defendant City of New York is jointly and severally liable with the named individual Defendants for the First Cause of Action.

**WHEREFORE,** Plaintiff requests judgment as follows:

Against Defendants City of New York, Sergeant Ian Nadel, and Police Officer Wright, jointly and severally, for the First and Second Causes of Action under 42 U.S.C. Sec. 1983:

i.      General and compensatory damages for the time and effort that Plaintiff had to expend appearing in Court after the arraignment in the criminal action, the loss of freedom and liberty that she sustained while she was at these numerous Court appearances, and the emotional, mental, and physical distress that Plaintiff

sustained and has suffered as a result of Defendants' actions, in an amount to be determined at trial and in accordance with evidence;

ii.    Specific damages for the amount of income Plaintiff lost and the amount of money she spent on therapy as a result of Defendants' actions, in an amount to be determined at trial and in accordance with evidence;

iii.    Punitive damages, in an amount to be determined at trial and in accordance with evidence;

iv.    Reasonable attorneys' fees and the costs and disbursements of this action; and

v.    Such other relief as Plaintiff may be shown entitled to.


Dated:  Brooklyn, New York
       January 10, 2018

             By:     /s/ /b/ Kathy A. Polias, Esq.
                  Kathy A. Polias, Esq. (KP-9025)
                  Attorney-at-Law
                  *Attorney for Plaintiff Iris Biton*
                  68 Jay Street, Suite 201
                  Brooklyn, NY 11201
                  Tel. No.:  (718) 514-2062

# EXHIBIT A

LAW

# AUDIO: New York's Police Union Worked With the NYPD to Set Arrest and Summons Quotas

*The department's emphasis on numbers and the union's cooperation has led to millions of suspicion-less stop-and-frisks.*

By Ross Tuttle

MARCH 19, 2013

Audio obtained by *The Nation* confirms an instance of New York City's police union cooperating with the NYPD in setting arrest quotas for the department's officers. According to some officers and critics of quotas, the practice has played

a direct role in increasing the number of stop-and-frisk encounters since Mayor Michael Bloomberg came to office. Patrolmen who spoke to *The Nation* explained that the pressure from superiors to meet quota goals has caused some officers to seek out or even manufacture arrests to avoid department retaliation.

The audio makes up part of the prosecution's case in the landmark federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, which opened yesterday in US District Court for New York's Southern District and which was brought forward by the Center for Constitutional Rights.

The audio, recorded in 2009 by officer Adhyl Polanco, is part of a series of recordings originally released to the media that year, and a selection first aired on WABC-TV in 2010. But WABC-TV used only a small portion of the recordings, and did not air the union representative's explosive admission.

"I spoke to the CO [commanding officer] for about an hour-and-a-half," the Patrolmen's Benevolent Association delegate says in the audio recording, captured at a Bronx precinct roll call meeting. "Twenty-and-one. Twenty-and-one is what the union is backing up.... They spoke to the [Union] trustees. And that's what they want, they want 20-and-1."

*Listen to the full audio:*

0:00 / 12:35

"Twenty-and-one means twenty summonses and one arrest a month," says a veteran NYPD officer who listened to the recording, and who spoke to *The Nation* on the condition of

anonymity. Summonses can range from parking violations, to moving violations, to criminal court summonses for infractions such as open container or public urination.

"It's a quota, and they [the Union] agreed to it," says the officer. "It's crazy."

"Many officers feel pressure to meet their numbers to get the rewards that their commanding officer is giving out," says John Eterno, a former police captain and co-author of *The Crime Numbers Game: Management by Manipulation*. But if an officer's union delegate is also pushing the numbers, "this puts inordinate pressure on officers, getting it from the top down and getting it from the union."

The plaintiffs in the *Floyd* case allege that the New York Police Department's stop-and-frisk policy results in unconstitutional stops based on racial-profiling. The department's emphasis on bringing in arrest and summons numbers has caused officers to carry out suspicion-less stops in communities of color.

As Polanco explained in court today, his superiors would often push him to carry out this specific number of summons and arrest stops per month: "20-and-1, they were very clear, it's non-negotiable, you're gonna do it, or you're gonna become a Pizza Hut delivery man."

"There's always been some pressure to get arrests and summonses," says Eterno. "But now it's become the overwhelming management style of the department. It has become a numbers game. They have lost the ability to see that communities are dissatisfied with this type of policing, especially minority communities. They are the ones being

overly burdened for doing the same sorts of things that kids in middle-class neighborhoods are doing—only they're getting records because officers have to make these arrests."

When asked for comment, Al O'Leary, a spokesperson for the Patrolman's Benevolent Association, said: "The PBA has been consistently and firmly opposed to quotas for police activities including arrests, summonses and stop-and-frisks. These are all effective tools for maintaining order when they are left to the discretion of individual police officers but become problematic when officers are forced to meet quotas. This union has sought and obtained changes to state law making quotas for all police activities illegal. We have sued and forced an individual commanding officer to stop the use of illegal quotas and will continue to be vigilant and vocal in our opposition to police activity quotas."

* * *

Physical evidence has periodically surfaced of the existence of numerical arrest targets for NYPD officers, though arrest and summons quotas for police have been illegal in New York State since 2010. Precinct commanders defend their right to set productivity goals for their staff—but what the department defines as productivity goals can have the force of quotas when officers are subject to retaliation for not meeting them.

Cops who have spoken to *The Nation* say that retaliation can take many forms, including denied overtime; change of squads and days off that can disrupt family obligations like taking children to school or daycare; transfers to boroughs

far from home in order to increase their commute and the amount they'll have to pay in tolls; and low evaluation scores.

Officers even reported being forced to carry out unwarranted stops to fulfill the summons and arrest numbers. In a second recording obtained by *The Nation*, a captain addressing a roll call in the same Bronx precinct illustrated how such retaliation plays out.

"When the chief came in…[he] said: 'you know what, you really can't reduce crime much more, the guys are doing a great job,'" the captain can be heard saying in the rough audio. "[He] said that we can…get some of our people who aren't chipping in to go to some locations [where we are] having problems, and give them [the area's residents] the business…"

The recording continues: "That's all we're asking you to do, that's all, that's all. And if we do that, everyone chips in, it's fine. It's really nonnegotiable. 'Cause if you don't do it now, I'm gonna have you work with the boss to make sure it happens."

"If you don't meet the quota, they will find [activity] for you," another veteran officer explained to *The Nation*. "The sergeant will put you in his car and drive you around until whatever he sees he will stop and tell you to make an arrest or write a summons, even if you didn't observe what he said it was."

Sometimes these are legitimate stops, but other times, they're bogus: "The sergeant told me to write two minorities for blocking pedestrian traffic," the anonymous officer said,

but they were not blocking pedestrian traffic.

The pressure for numbers, say cops, is unrelenting, and it's leading to high anxiety and low morale. And that the union, an organization that is supposed to have officers' interests at heart, is involved in the setting of quotas is mystifying, says one cop.

It's all the more problematic given the union's very vocal and public stance against quotas, such as in their ad campaign, "Don't Blame The Cop," which tries to engender sympathy for the officers who are pressured to write tickets and arrest motorists. "Blame NYPD management," it says.

This development also signals to officers that there is one fewer place they can go to register their concern about departmental policy and practice. "I feel foolish for having gone to my [union] delegate with my complaints," says one officer who has been unsettled by the continued pressure to meet quotas.

Adhyl Polanco, the officer who recorded the audio and first brought it to the attention of the press, has since had charges brought against him by the department for writing false reports—the same false reports he pointed out to the department's Internal Affairs office as evidence of the quota system. Polanco maintains these and other charges against him and other officers who have spoken out are evidence that the department is retaliating against him and others for blowing the whistle.

The NYPD has just surpassed 5 million stop-and-frisks during the Bloomberg era. Most stops have been of people of color, and the overwhelming majority were found innocent

or any wrongdoing, according to the department's own statistics. And though the number of stops may have gone down recently—as pressure on the department and increased awareness of the policy has officers and supervisors thinking twice about how they employ the practice—the existence of quotas ensures that New Yorkers will continue to be harassed unnecessarily by the NYPD.

"The way I think about it," says a patrolman, "is, say a fireman is told by a supervisor, we need you to put out fifteen fires this month. And if you don't put out fifteen fires you're gonna get penalized for it. So if he doesn't find fifteen fires to put out, is that his fault? It's not. But the fireman might even go out there and start setting fires, causing fires, just so he's not penalized or looks bad…. And that's kind of what the police officers are doing."

*What are the plaintiffs in the Floyd v. City of New York case fighting against? Watch the exclusive video of a stop-and-frisk encounter gone wrong.*

*Editor's note: This piece has been edited since publication to reflect the response of the Patrolmen's Benevolent Association, and to reflect that the audio was played in court on March 20. Voices in the above video have been altered to protect the identities of the officers interviewed.*

**Ross Tuttle** Ross Tuttle is a documentary filmmaker and freelance journalist living in New York who is working on a long-form documentary examining various aspects of the criminal justice system in New York.

To submit a correction for our consideration, click *here*.
For Reprints and Permissions, click *here*.

| | | Hampstead... | King Kong... | Ashton 3 Pie... | Chadwick T.. |
| | Phillipe Entertai... | Boulder Sof... | Sierra TV C... | Alice Brown... | Dakota Sofa... |

**LABOR**   **UNIONS**   **FLORIDA**

# A Labor Battle at... Disney World?

*Unionized workers across Disney's Orlando properties are fighting for a living wage and a permanent place in the community.*

By *Michelle Chen*

YESTERDAY 10:00 AM



Disney World in Orlando, Florida. *(Kinchan1, CC BY 2.0)*

I t wasn't exactly glad tidings for the holiday, but the workers of the world of Disney cheered loudly in late December as they voted overwhelmingly to reject the company's latest contract offer for its thousands of Orlando service employees. The workers chose to demand more negotiations rather than settle for a miserly wage offer, even if it meant heading into the new year with more uncertainty.

The political climate has raised the stakes for the wage talks, as Florida's massive hospitality workforce has been besieged by a brutal storm season, stagnant wages amid soaring costs of living, and, under Trump, an onslaught of federal immigration crackdowns. Disney, meanwhile, is rounding out a banner year with a deal to take over the Fox News empire.

According to the contract schedule, the union can renegotiate wages now as part of a contract renewal in 2019. Disney's last offer for a pay increase fell short of the demand from the union, UNITE HERE's Service Trades Council, for a $15 starting hourly wage. Currently only about one in eight

KEEP READING

AdChoices [>]

**POLITICS**   10/02/2014 01:48 pm ET | **Updated** Oct 02, 2014

# Police Quotas Are Terrible, And The NYPD Still Seems To Be Using Them

 **By Christopher Mathias**



RUDI VON BRIEL VIA GETTY IMAGES

NEW YORK — If there's one subject on which New York City police unions and police reform advocacy groups seem to agree, it's this: Arrest quotas for police officers are terrible and counterproductive, and they sow distrust between cops and communities.

When NYPD Commissioner William Bratton took office in January, he promised an end to arrest quotas, as well as the numbers-driven policing culture championed by his predecessor, Ray Kelly. "I want to focus on the quality of police actions, with less emphasis on our numbers and more emphasis on our actual impact," Bratton said in a video statement.

But 10 months into Bratton's tenure as top cop, a new report claims that quotas — which are illegal under New York state law — remain alive and well in the NYPD.

"Though police brass well deny it, here's how the quota system works and does harm: Precinct Captains or Lieutenants, under pressure from police headquarters, direct officers to meet specific goals regarding arrests and summonses and deploy the officers in particular neighborhoods," said Robert Gangi, director of the Police Reform Organizing Project, in an emailed press statement. On Tuesday, Gangi's group released a report calling on Bratton and Mayor Bill de Blasio to put an end to the quota system.

"Everyone in those communities becomes a potential criminal even if their criminality is fabricated by officers to meet monthly 'productivity' goals," Gangi continued.

The NYPD did not respond to a Huffington Post request for comment on PROP's report.

The report points to the number of misdemeanor arrests under Bratton, as well as the poor quality of those arrests, as evidence that New York cops are still operating under a quota system.

According to statistics compiled by the New York State Division of Criminal Justice Services, there were 137,039 misdemeanor arrests in New York during the first seven months of Bratton's time as commissioner. That's almost 1,000 more such arrests than

during the same period in 2013 under former Commissioner Kelly. Eighty-six percent of those charged with a misdemeanor in the first seven months of this year were people of color, representing a decline of only 1 percent from the same time period in 2013.

PROP regularly sends monitors into New York City's arraignment courts in order to document the most common arrests and summonses made by NYPD officers.

"In cases PROP has observed, the accused, almost always a man or woman of color, was charged with a minor infraction like: begging, sleeping on a park bench or subway, walking between subway cars, jaywalking, or having an open alcohol container," reads Tuesday's report. "Most people walked out of the courtroom with the charge dismissed or a minor sanction applied. The court had clearly decided that the person was not a risk to the community."

Gangi also conducted an informal interview with one New York City police officer who said the NYPD is still operating under an "unwritten" quota system, with officers under pressure to make numbers.

**140**

Gangi argues that the quota system was firmly ingrained in the police department during the past decade, and that Bratton will need to make a bigger, "strong-arm effort" to ensure that it's eradicated.

In 2008, officer Adrian Schoolcraft started secretly recording his supervisors telling him and his fellow cops in the Bedford-Stuyvesant neighborhood of Brooklyn to meet a series of stop-and-frisk and arrest quotas. Two other whistleblowers, officers Pedro Serrano and Adil Polanco, made similar recordings at their precincts in the Bronx around the same time.

Polanco later testified about quotas in a federal class-action lawsuit brought against the city over the NYPD's use of stop and frisk, a policing strategy that had officers stop, question and search hundreds of thousands of people on the street every year, most of them minorities.

"There came a point in time in 2009 where they came very hard with the quotas. They call it productivity," Polanco testified, according to The Nation. After every patrol, Polanco said, he and his fellow officers would have to report to their commander "and specifically tell him what we had done for that night."

"They will never question the quality" of the arrests, Polanco said. "They will question the quantity ... How we got them, they don't really care about."

In the 2013 ruling that declared the NYPD's use of stop and frisk unconstitutional, a federal judge also called out the department's use of quotas.

"Imposing numerical performance goals for enforcement activities, without providing effective safeguards to ensure the activities are legally justified, could result in an officer taking enforcement action for the purpose of meeting a 'performance goal' rather than because a violation of the law has occurred," wrote Judge Shira Scheindlin.

A few months after that ruling, then-public advocate Bill de Blasio was elected mayor with a sweeping mandate to reform the NYPD. Although de Blasio has kept his promise to rein in the NYPD's use of stop and frisk — which has fallen off dramatically this year — it's unclear how aggressively he and Bratton have tried to eliminate quotas.

"Certainly the quotas for stop, question and (sometimes) frisk have ceased," an official from the Patrolmen's Benevolent Association told HuffPost. The PBA is the city's largest police union, and has been vocal in its opposition to quotas for cops. "We'll have to wait and see about summonses and arrests," the official said.

Last month, Bratton told reporters that "there are no quotas in the NYPD and if I [...] find any of my personnel operating under a quota system, they're going to be gone. We are after quality, not quantity."

But according to Eli Silverman, a professor at the John Jay College of Criminal Justice in New York, rank-and-file cops "need more than just a proclamation from above" that quotas are dead.

"They have to hear it in the CompStat meetings, they have to hear it from supervisors, in roll call," Silverman said. He added that cops also need to be assured they won't face consequences, like losing overtime or vacation days, if they fall short of productivity goals.

Tuesday's report calls for an "overhaul" of the system by which cops are evaluated. It describes a "new approach" that would "emphasize not only punitive interactions with New Yorkers like arrests and summonses, but also constructive contacts like meeting with local clergy and social service providers, intervening in minor disputes before they escalate into actual violence and physical harm, and instead of arresting and locking up homeless persons sleeping under an apartment building stairwell for trespass, bringing them to a neighborhood organization that can provide needed services."

Silverman, a co-author of _The Crime Numbers Game_, a book on police quotas, told HuffPost Wednesday that he remained encouraged by Bratton's vow to stop quotas. He urged New Yorkers to be patient with the commissioner.

"It's difficult to make wholesale changes in such a short time," he said, "especially when this quota system has been entrenched for so long."

_Do you have information you want to share with HuffPost? Here's how._

**ALSO ON HUFFPOST:**



Christopher Mathias 🐦
National Reporter, The Huffington Post

Suggest a correction

**MORE:**

Nypd · Nypd Quotas · William Bratton · Eli Silverman · Police Reform Organizing Project

### You May Like

Sponsored Links by Taboola

Angelina Jolie's New Go-To Travel Shoe Is Surprisingly Affordable
Vogue | Everlane

See The Face Mask That Drew Barrymore Says Changed Her Life
Town and Country | Hanacure

The Sweatshirt Designed by an Apple Engineer That's Bringing Manufacturing Back to America
Business Insider | American Giant

Murphy's House Makes Alcatraz Looks Like A Paradise
Refinance Gold

Pay off Your Mortgage With New York Stimulus
Fetcharate

No Couple at the Golden Globes Was Cuter than These Two
Livingly

## MOST SHARED

**James Franco Responds To Sexual Misconduct Allegations**

**A Busy Mom Tried HelloFresh: Here's What Happened**
Sponsored by HelloFresh

**Sarah Hyland Under Fire For Tone-Deaf Golden Globes After-Party Video**

**Oprah Winfrey's Video Shows Mudslide Impact On Her Home**

**Republicans Have 4 Convicted Criminals Running For Congress In 2018**

# WHAT'S HOT

**Celine Dion Handles Dry-Humping Woman With The Power Of Love**

**Don't Buy Furniture Until You See This Site**
Sponsored by Wayfair

**Robert De Niro Gives Trump An X-Rated New Nickname In Awards-Show Rant**

**'Last Jedi' Editor Has Some Second Thoughts About That Off-Screen Death**

**Serena Williams Talks About The Terrifying Complications She Faced After Giving Birth**

**Congressman Trolls Trump With Introduction Of 'Stable Genius Act'**

**5 Tips on How to Afford a Baby**
Sponsored by Santander Bank

**Photos Capture Brutal Devastation Of California Mudslides**

ABOUT US     RSS     User Agreement

ADVERTISE     FAQ     Privacy Policy

About Our Ads     Careers     Comment Policy

Contact Us     Archive

©2018 Oath Inc. All rights reserved. HuffPost News



WNYC Radio

NATIONAL

# Despite Laws And Lawsuits, Quota-Based Policing Lingers

Listen · 4:53    Queue   Download

Transcript

April 4, 2015 · 4:47 AM ET
Heard on Weekend Edition Saturday

JOEL ROSE



Multiple lawsuits accuse the New York City Police Department of pressuring officers into fulfilling monthly quotes for tickets and arrests, resulting in warrantless stops. The NYPD denies the allegations.

*Spencer Platt/Getty*

In New York City, police rarely talk on the record at all, especially about a touchy subject like quotas. But Officer Adhyl Polanco is an exception.

"The culture is, you're not working unless you are writing summonses or arresting people," says Polanco.

One of the dirty secrets in law enforcement that no one likes to talk about is quotas. Police departments routinely deny requiring officers to deliver a set number of tickets or arrests. But critics say that kind of numbers-based policing is real, and corrodes the community's relationship with the police.

"

"I can tell my supervisors that I took three people to the hospital and I saved their lives. That the child that I helped deliver is healthy. I can tell them that. But that's not going to cut it."

Adhyl Polanco

Polanco joined the force in 2005, and pretty quickly, he says, it became clear that his supervisors only cared about two things: tickets and arrests.

"I can tell my supervisors that I took three people to the hospital and I saved their lives. That the child that I helped deliver is healthy," says Polanco. "I can tell them that. But that's not going to cut it."

Polanco says he encountered an unwritten rule that officers are expected to bring in "20 and one." That's 20 tickets and one arrest per month. But it was tough to get anyone outside the department to believe him, because NYPD officials would always deny there were any quotas. They still do.

"There is no specific target number that we go for," said NYPD Commissioner William Bratton at a press conference in January. "There are no quotas, if you will."

Since taking over the department last year, Bratton has insisted he's more interested in the quality of arrests than the quantity. The NYPD declined to comment for this story.

Back in 2008, Officer Polanco was determined to expose the NYPD's alleged quota system. So he secretly recorded conversations inside his precinct house in the Bronx.

"Next week, it could be 25 and one. It could be 35 and one," says a man Polanco identifies as a sergeant. The man heard in the recording is pushing his officers to get their numbers up. If they don't, he threatens, it could get even worse: The quota could be 25 tickets a month, or 35.

"Until you decide you're going to quit this job and become a Pizza Hut delivery man, this is what you're going to be doing until then," the man says.

Now Polanco is suing the NYPD, one of several whistle-blower lawsuits over alleged quotas at the department. Arrest and ticket quotas are illegal in several states, including New York, Illinois, California and Florida. But even former law enforcement officials will tell you they still exist.

"Does it happen in some places? Yeah, I'm sure it does," says Chuck Wexler, executive director of the Police Executive Research Forum. Wexler says some of the 18,000 police departments across the country probably do have quotas.

"On the one hand, there is an understandable desire to have productivity from your officers," says Wexler. "But telling them that you want to arrest x number of people, you have to cite x number of people, it just encourages bad performance on the part of officers."

Wexler says the problem can get especially bad if officers start to view the community they're policing as a source of revenue. That, according to the Justice Department, is exactly what happened in Ferguson, Mo. As NPR and others have reported, the largely white police there wrote huge numbers of tickets for the city's black residents, collecting millions of dollars in fines every year.

**DOJ: Ferguson Police Routinely Discriminate Against African Americans** March 4, 2015

"Our view is that this is not solely a Ferguson problem," says Laurie Robinson, co-chairwoman of President Obama's Task Force on 21st Century Policing. She's also a former assistant attorney

CODE SWITCH



What Policing Looks Like To A Former Investigator Of Misconduct



AROUND THE NATION

NYPD Disciplinary Problems Linked To A 'Failure Of Accountability'

general and a professor at George Mason University. The task force concluded that numbers-based policing sends the wrong message to the public.

"If citizens believe that tickets are being issued or arrests are being made for reasons other than the goal of law enforcement, which is about public safety," says Robinson, "then their trust in the legitimacy of the system is really eroded."

So why does numbers-based policing seem to persist in some departments?

Maybe because it's an easy way to track officer productivity. Tim Dees, a retired Reno, Nev., police officer who has also taught criminal justice, says it's the quality of police work that counts, not the quantity.

"That's a much more difficult metric to gauge," says Dees. "The satisfaction of the citizen, very difficult to put a value on that. And it's much easier for, frankly, lazy administrators to make it into a numbers game."

But some rank-and-file officers say the numbers game can actually make their jobs harder. NYPD Officer Adhyl Polanco says that in order to be effective, he needs the trust of the community.

"Nobody in the community wants people selling drugs in their building," Polanco says. "Nobody in the community wants shootings, so if we work with the people who don't want that, together we can identify who the criminals are. But what happens when you start harassing innocent people because I have to come up with my 20 [tickets]?"

Those tickets might look like productivity on paper, says Polanco. But he argues they're not actually making anyone safer.

policing    traffic tickets    new york city    police    nypd

# How Aggressive Policing Affects Police Officers Themselves

The pressure on cops to consistently deliver arrests and traffic stops is immense, and can discourage them from taking more effective approaches that aren't as quantifiable.



Eduardo Munoz / Reuters

SAKI KNAFO  |

JUL 13, 2015  |  BUSINESS

One of the questions at the heart of the national debate over race and policing is why minorities are routinely arrested for petty offenses—drinking on the sidewalk, hanging out in the park after it closes, driving with a suspended license. One reductive explanation for these arrests is that there's simply more crime in predominantly black and Latino neighborhoods. Another is that cops stereotype minorities as miscreants. But what if some of these arrests are motivated by something more official?

That's what a class-action lawsuit filed by several cops against the New York City Police Department alleges. The lawsuit, which was filed four months ago, takes issue with the department's alleged implementation of quotas for arrests and court summonses. Such quotas are prohibited in New York, as well as in several other states, but the NYPD, the plaintiffs maintain, nevertheless holds officers to monthly goals for making arrests and writing tickets.

The plaintiffs' complaint carries troubling implications. As police officers, after all, they have great authority over the lives of other Americans. But their fundamental concern—how a focus on metrics can distort a job's larger purpose—is not unique to police work. America's workers are being monitored more and more closely by their managers. The number of hours worked, number of meetings attended, and even preferred Internet browser can be used to extrapolate productivity, possibly leading to an overemphasis on work that is quantifiable, to the exclusion of work that isn't. The collection of data isn't inherently problematic, but it does run the risk of fostering a system that rewards cops for filling jails without necessarily reducing violent crime or helping the community at large.

The problem, the plaintiffs say, is that police commanders will often try to appease the department's top brass by pushing their officers to make more arrests in poorer, minority neighborhoods. While there are often higher rates of serious crime in these areas, a quantitative approach means that police face pressure to respond to such crimes by arresting people for trivial reasons—or for no reason at all. If the cops don't fulfill their quotas, according to the plaintiffs, their superiors penalize them, denying their vacation requests, assigning them to midnight shifts, or limiting their hopes of getting promoted.

The plaintiffs, all of them minorities themselves, have been arguing that it's tough to make a decent living and advance in their jobs without engaging in this aggressive, numbers-based style of policing. They complain that this means-to-an-end, results-based mentality can put them in a bind. Sandy Gonzalez, an officer in the Bronx and the lawsuit's lead plaintiff, described the dynamic to me by

imagining what he'd say to a hypothetical offender: "When it comes to the end of the month, and I need that number ... dude, it's your neck or mine."

If penalties such as denied vacation requests do indeed exist, it's easy to see why some cops might do whatever they can to avoid them. In a city and a country where blue-collar jobs are harder and harder to come by, law enforcement still offers a clear path to the middle class and the nice things that come with it—the house in Staten Island, the two cars in the driveway, college tuition for the kids. Cops who receive positive evaluations can join specialized units and eventually rise to the coveted rank of detective, earning as much as six figures a year.

But when officers fail to deliver the desired numbers, that path can close up quickly, some officers say. Gonzalez, for example, says he received a failing grade on an important evaluation because he hadn't met a monthly quota. Another cop I talked to said the temptation to make unnecessary arrests can be overwhelming. The NYPD, she said, puts its own cops in "financial handcuffs."

NYPD officials have long denied that there's a quota system in the department, even as, over the years, a series of lawsuits have challenged that claim. Most recently, an attorney filed documents in Manhattan Federal Court charging the NYPD with engaging in a "stunning pattern" of evidence destruction to cover up the quota system, as *The New York Daily News* recently reported. (The NYPD didn't respond to my requests for comment about these allegations or the other claims made by those mentioned in this article.)

According to whistleblower cops such as Gonzalez, supervisors in the NYPD often try to euphemistically maneuver around the quota ban by pressuring cops to generate more "activity." If supervisors don't apply enough pressure, they themselves might risk punishment or humiliation at the hands of their higher-ups.

Calls for increased "activity" are not the same as quotas per se, and a court may find that they're different enough to be deemed legal. However, even lawful pressure to ramp up activity in the absence of specific quotas may be just as harmful: Commanders who constantly prod their underlings to think more about

results open up the possibility of needlessly aggressive policing, whether they attach numbers to their demands or not.

Just as in New York, trials around the country have uncovered evidence of quota systems, even as local police departments deny their existence. Recently, a Sacramento jury awarded $125,000 to a 78-year-old man who had sued a pair of highway cops for wrongfully arresting him during a traffic stop after one of the officers punched him and knocked him to the ground. Documents produced at the trial showed that the cop who pulled the man over had previously been reprimanded by the California Highway Patrol for being too soft on drivers. The cop's average of five "enforcement contacts" per day was "not acceptable," an evaluation introduced as evidence declared—in other words, he needed to pull more people over.

So what's the alternative to quotas? Unlike some critics, the plaintiffs in the NYPD lawsuit aren't arguing for the decriminalization of minor violations. What they want is to be able to use their judgment when it comes to responding to these offenses. As Gonzalez put it, "Sometimes putting handcuffs on people isn't the way to resolve something."

The opposition to quotas can transcend the usual ideological lines. It is one of the rare debates that finds Patrick Lynch, the outspoken leader of the Patrolman's Benevolent Union, on the same side as the New York Civil Liberties Union. Even Bill Bratton, the commissioner of New York's police force, who rose to national renown while championing numbers-based policing during his first stint as the head of the department back in the '90s, has recently said he intends to shift the department's focus to "the quality of police actions, with less emphasis on their numbers, and more emphasis on our actual impact."

Not everyone finds this rhetoric persuasive, however. I recently talked to an officer who, speaking on the condition of anonymity because she feared repercussions at work, said she feels professional pressure to be more aggressive. She told me that her friends had been hiring her to do hair and makeup at their weddings, providing her with a little extra cash to supplement her veteran cop's salary. Engaging in

entrepreneurial efforts such as these, she said, are the only way she's able to afford not to play the department's numbers game.

A woman in her forties with nearly 20 years on the job, she questioned the department's sincerity when it came to favoring quality over quantity. "As much as they say they care about the people and the public, they don't," she said. "They'll be at the community meeting saying, 'We're gonna do this, we're gonna do that,' but once roll call hits, it's, 'Hammer them. Give me 10 summonses.'"

**ABOUT THE AUTHOR**



**SAKI KNAFO** is a writer based in New York. His work has appeared in *The New York Times Magazine* and *GQ*.

🐦 Twitter



US
EDITION

**POLITICS**  12/07/2015 03:48 pm ET

# NYC To Pay $280,000 Over Cop Who Exposed City's Quota System

Officer Craig Matthews says he faced retaliation after blowing the whistle on illegal NYPD practices.

 **By Christopher Mathias**

New York City has agreed to pay $280,000 to settle a lawsuit filed by NYPD whistleblower Craig Matthews, who says he faced retaliation after he complained about the police department's use of an illegal quota system.

"This settlement completely vindicates Officer Matthews, who had the courage to speak out about illegal police quotas and suffered serious retaliation for having done so," Christopher Dunn, associate legal director at the New York Civil Liberties Union and Matthews' representative in court, said in a statement Monday.

"Quota systems in the NYPD drove the explosion of unlawful stops and arrests during the [Michael] Bloomberg administration and seriously damaged police-community relations," Dunn continued. "Officer Matthews was right to object to the quota system in his precinct, and this settlement establishes that police officers will be protected when they blow the whistle on unlawful NYPD policies."

Beginning in 2008, Matthews says he and other officers in the Bronx's 42nd Precinct were pitted against each other in a race to see who could make the most arrests, carry out the most stop-and-frisk actions and issue the most summonses. Official department reports divided officers into those who made or exceeded goals set by mid-level supervisors and those who did not. In the reports, officers who didn't meet goals were highlighted in red.

     *042 PRECINCT*
## Month to Date Officer Activity Report
From Sunday, January 1, 2012  to Sunday, January 15, 2012 

| Officer Last Name | Officer First Name | Tax Number | Felony Arrests | Misdemeanor Arrests | Violation Arrests | C- Summonses | SQF Reports | Complaint Reports | Aided & Accidents |
|---|---|---|---|---|---|---|---|---|---|
| | | | 2 | 2 | 0 | 1 | 6 | 3 | 0 |
| | | | | | | 1 | 1 | 3 | 1 |
| | | | 0 | 2 | 0 | | | 1 | 0 |
| | | | 2 | 0 | 0 | 3 | 5 | 2 | 2 |
| | | | 0 | 1 | 0 | | | 2 | 0 |
| | | | 1 | 1 | 0 | | 1 | 1 | 0 |
| | | | | | | | 3 | 0 | 0 |
| | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | 2 | | 2 | 2 |
| | | | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| | | | 0 | 0 | 0 | 0 | 0 | 4 | 0 |

NYCLU

· According to the 2012 federal lawsuit, Matthews complained to successive precinct commanders that this practice led to "unjustified stops, arrests, and summonses," and that it had "an adverse effect on the precinct's relationship with the community." As a result, Matthews says he was given punitive assignments and denied overtime pay and leave. He also says he was threatened and harassed by fellow officers and given poor work evaluations.

Although his lawsuit was initially dismissed, it was reinstated earlier this year by a federal appeals court, which ruled that Matthews' complaints to the department were protected by the First Amendment.

Monday's settlement agreement voids any poor work evaluations Matthews received, and removes him from punitive assignments. Matthews, a 17-year veteran of the force, will also receive $125,000 dollars in damages and over $30,000 in lost overtime wages. The city will also pay the NYCLU $130,000 in legal fees.

The New York City Law Department said in a statement Monday that settling the lawsuit was in the "best interest" of the city. The settlement agreement still needs to be approved by the federal District Court in Manhattan. The city did not admit wrongdoing in the settlement.

Matthews is among a handful of NYPD whistleblowers to have faced retaliation in recent years for exposing police quotas, which are illegal under New York state law.



COREY SIPKIN/NEW YORK DAILY NEWS VIA GETTY IMAGES

NYPD whistleblower Adrian Schoolcraft.

In 2008, Officer Adrian Schoolcraft started secretly recording his supervisors telling him and his fellow cops in the Bedford-Stuyvesant neighborhood of Brooklyn to meet a series of stop-and-frisk and arrest quotas. Two other whistleblowers, Officers Pedro Serrano and Adil Polanco, made similar recordings at their precincts in the Bronx around the same time.

All three men faced threats and harassment. Schoolcraft was even forcibly detained and hospitalized.

"A strong, effective law enforcement agency needs police officers that speak out against misconduct when they see it," NYCLU senior staff attorney Erin Harrist, a co-counsel in Matthews' case, said in a statement Monday. "Today's settlement reflects the significant value of police officers' and public employees' free speech rights."

*Do you have information you want to share with HuffPost? Here's how.*



**MORE:**

Nypd   Stop And Frisk   Nypd Whistleblower   Craig Matthews   Police Quotas

## You May Like

Sponsored Links by Taboola

Angelina Jolie's New Go-To Travel Shoe Is Surprisingly Affordable

Vogue l Everlane

The Sweatshirt Designed by an Apple Engineer That's Bringing Manufacturing Back to America

Business Insider i American Giant

Nurse Puts Dying Baby Next To Her Twin To Say Final Goodbye And Then Witnesses A Miracle

NewsD

Senior Living in Brooklyn Can Be Surprisingly Classy

Senior Living l Sponsored Links

Pay off Your Mortgage With New York Stimulus

Fetcharate

See The Face Mask That Drew Barrymore Says Changed Her Life

Town and Country l Hanacure

## MOST SHARED

**James Franco Responds To Sexual Misconduct Allegations**

**Oprah Winfrey's Video Shows Mudslide Impact On Her Home**

**Sarah Hyland Under Fire For Tone-Deaf Golden Globes After-Party Video**

**Republicans Have 4 Convicted Criminals Running For Congress In 2018**

## WHAT'S HOT

**Celine Dion Handles Dry-Humping Woman With The Power Of Love**

**We Tried HelloFresh: Here's How It Went**
Sponsored by HelloFresh

**Robert De Niro Gives Trump An X-Rated New Nickname In Awards-Show Rant**

**'Last Jedi' Editor Has Some Second Thoughts About That Off-Screen Death**

 NYC To Pay $280,000 Over Cop Who Exposed City's Quota System 

**Congressman Trolls Trump With Introduction Of 'Stable Genius Act'**

**Ben Stiller Reading Trump's 'Stable Genius' Tweets As Zoolander Is Like Ridiculously Funny**

**Don't Buy Furniture Until You See This Site**
Sponsored by Wayfair

**Photos Capture Brutal Devastation Of California Mudslides**

ABOUT US

ADVERTISE

About Our Ads

Contact Us

RSS

FAQ

Careers

Archive

User Agreement

Privacy Policy

Comment Policy

©2018 Oath Inc. All rights reserved. HuffPost News



News

Local   Top Video   Train Pain   U.S. & World   Health   Weird   Weather   Tech   Sports


RECOGNIZING EXCELLENCE IN THE PRACTICE OF LAW

CONGRATULATIONS TO OUR 2018 MEMBERS

LAWYERSOFDISTINCTION.COM

# NYPD Still Enforces Illegal Quota System, Minority Officers Allege in Lawsuit

By Sarah Wallace

Published at 1:24 PM EST on Feb 25, 2016






wayfair   FREE SHIPPING on Orders Over $49 & EASY RETURNS

Shop Now

There's a war of words between an NYPD officer and the police commissioner over a claim of quotas for arrests and tickets. The department says they don't exist, but some officers say otherwise. Investigative reporter Sarah Wallace has an I-Team exclusive with the officer making the claims. (Published Wednesday, Feb. 24, 2016)

‹               ›

**NYPD Officer at Odds With Department Over Quota Claims**

On the Trail of Lost Luggage at JFK Airport

Beloved Washington Heights Bar Coogan's Closing After 33 Years

Robber Snatches Cash from 4-Year-Old Girl

## TRENDING STORIES


1   Girl Dies After Being Stabbed at NY Donut Shop: Police


2   Former Obama Secretary to Investigate JFK Airport Fiasco


3   Teen With Scholarship Shot in Chest at Williamsburg Deli


4   Shooting at NYC High-Rise Leaves 2 Dead, 1 Critical: Police

## WEATHER FORECAST

⚡ WEATHER ALERTS                    View all

Flushing, NY

40° Broken Clouds
Feels Like 34°

      
Radar        Forecast        Maps

Despite public denials and a state ban against quotas, NYPD commanders still enforce a quota system for arrests and summonses, pressuring officers to target predominately minority neighborhoods, a dozen current and former minority cops charge in a federal class action lawsuit.

When asked this week about the explosive allegations, Police Commissioner Bill Bratton issued a colorful and emphatic denial.

"Bull sh--- is my response to that," said Bratton, adding that the department doesn't focus on numbers but rather on how to reduce crime.

But the lead plaintiff in the lawsuit that accuses the NYPD of violating the state ban on quotas and punishing officers who refuse to follow discriminatory practices spoke exclusively with the I-Team and said that quotas "absolutely exist."

- **Nature Made Vitamins Recalled**

"It's illegal and it's immoral and it's unethical so they can never admit to it," said Edwin Raymond, an 8-year veteran of the NYPD. "But it exists and it's very real."

The pressure on officers for quotas is so great that predominately white neighborhoods are "actually policed" while "black and Hispanic neighborhoods are hunted," said Raymond, who was born in raised in East Flatbush.  He said the quotas result in innocent people getting into legal trouble for "innocuous behavior."

Raymond, who was recently passed over for a promotion, says he secretly recorded conversations over the last two years to capture proof that quotas exist despite a state ban in 2010 and repeated denials by NYPD brass.

- **SUV Smashes Cars, Crashes Onto Sidewalk in Wild Chase**

"They've broken the law," Raymond said. "The same way the NYPD records people breaking the law, that's what I did. I basically conducted my own investigation."

Raymond's lawyer says the quota system affect minority officers as well as communities of color.

"They get punished more for not making the quotas than white cops," attorney Chukwuemeka Nwokoro told the I-Team.

- **Meryl Streep Dressed as Donald Trump at NYC Gala**

The city has asked a judge to dismiss some elements of the lawsuit.  A ruling is expected within a couple of months.

*Get the latest from NBC 4 New York anywhere, anytime*



**Contact Sarah Wallace**
Twitter, Facebook, Email

**Download the App**
Available for IOS and Android

**Follow NBC New York**

## You May Like

Promoted Links by Taboola

Pay off Your Mortgage With New York Stimulus
Fetcharate

You've Been Shaving Wrong Your Whole Life! Find Out Why
Dollar Shave Club

Do You Come From Royal Blood? Your Last Name May Tell You.
Ancestry

Red Dress Takes Heat Amid Golden Globes All-Black Dress Code

Swatting victim family lawyer: 'Swatting is not new,' officers should have been prepared
NBC News

### WHAT DO YOU THINK?

**Do you lean towards traditional or non-traditional weddings?**

- ◯ Taditional
- ◯ Non-traditional
- ◯ No opinion

Insights powered by CivicScience | Privacy Policy


THESE INVESTIGATIVE TEAMS ARE **UNMATCHED. JUST LIKE YOU.** 4 I-TEAM | 47 INVESTIGA

NEWSLETTERS
Receive the latest local updates in your inbox
Email          Sign up
Privacy policy | More Newsletters


PopJulia  15% OFF on 1st Order   Shop Now

President of Church of Latter Day Saints dead at 90

NBC News

SPONSORED LINKS

MORE FROM NBC New York

- The Facial That Celebrities Say "Takes 10 Years Off" Your Face (Elle | Hanacure)

- Don't Wait: Shop The Best Tommy Hilfiger Winter Deal's Before The… (Macy's)

- She Adopts A Girl That Nobody Wants. 19 Years Later, She Looks … (EternalLifeStyle)

- 20 Celebrities Whose Siblings Are More Attractive Than They Are (Hooch)

- Play this for 1 minute and see why everyone is addicte… (Vikings: Free Online Game)

- Woman With Acid-Burned Face Lied About Being Attacked by Panhandler: …

- Anthony Weiner, Huma Abedin to Settle Divorce Privately

- Search for SoCal Storm Victims Continues

- Trump Endorses Return of Earmarks as House GOP Weighs Change

- NY Assemblywoman Stole Sandy Money from FEMA, Tried to Cover it Up: Prose…

Promoted Links by Taboola

**Leave Comments**



 Home News Local Investigations Entertainment 37 Connect

   **WEEKDAYS 11:30 AM** 

I-TEAM INVESTIGATIONS

## I-TEAM

MORE INVESTIGATIONS, MORE ANSWERS

SEND TIPS | 866-NEWS244

# I-Team: NYPD Lieutenant Latest Cop to Say Department Enforces Quota

"At the end of the month, these officers who don't have that arrest or those few summonses, they're pressured to find something," an NYPD officer says

By Sarah Wallace

Published at 5:36 PM EDT on Apr 1, 2016 | Updated at 11:00 PM EDT on Apr 1, 2016





An NYPD lieutenant is the latest active-duty cop to say that the department still uses arrest and summons quotas, despite a 2010 state ban on the practice and a denial from the city's top cop.


SO POWERFUL IT SEES THE STORM BEHIND THE STORM — STORM TRACKER 4 

### TRENDING STORIES

1  [VIDEO] 5K Bags Still Stuck at JFK After Weekend Meltdown: Sources


**NYPD Lieutenant Latest Cop to Say Department Enforces Quota**


Person Taken Away on Stretcher


Weiner Sexting Allegations Prompt Investigations


Snapchat Overdose Teen Makes Miraculous Recovery

3  Beloved Upper Manhattan Bar Closing After 33 Years

4  Displaced Puerto Ricans Find Intolerable Conditions in NYC

An NYPD lieutenant is the latest active-duty cop to say that the department still uses arrest and summons quotas, despite a 2010 state ban on the practice and a denial from the city's top cop.

### WEATHER FORECAST




⚡ WEATHER ALERTS                    View all

Flushing, NY



Investigations

who came forward this week "were telling the truth" about the illegal practice.

"There is still a quota system within the NYPD," the lieutenant said.

In an interview with the I-Team that aired Thursday, the 10 officers in the suit said that the NYPD still pursues quotas and punishes officers who don't hit numerical goals. The NYPD has repeatedly denied that quotas exist but that the department expects officers "to do their jobs."



I-Team: More NYPD Officers Say There's Proof of Quota-Driven Arrests

Quotas in the NYPD still exist for arrests and summonses in violation of a 2010 state ban on the practice, current on-the-job officers tell the I-Team, despite Police Commissioner Bill Bratton's repeated insistence that there are no quotas. Sarah Wallace reports. (Published Thursday, March 31, 2016)

The lieutenant, who is not part of the class-action suit, said cops are under constant pressure to meet quota numbers and that officers who don't hit numbers are refered to as "zeros."

"You know, every time I get called in the captain's office, it's 'one of your cops is a zero,'" the lieutenant said.

The lieutenant also reiterated the 10 officers' claims that cops were told to primarily target minority areas, and that cops who don't keep pace with quota numbers are punished.

- **Nature Made Vitamins Recalled**

"They are punished to the fact they will get very low evaluations," the lieutenant said.

The I-Team first learned of the alleged quotas from the lead plaintiff in the suit, Edwin Raymond. Raymond said that he had been secretly recording his supervisors for two years in an effort to prove the alleged quotas.

"This is something coming from the top that trickles its way down, and that's why we're here," Raymond told the I-Team on Thursday.

Radar   Forecast   Maps

**WHAT DO YOU THINK?**

Fetching questions...

SUBSCRIBE TO OUR 4 NEW YORK
NEWSLETTERS »

NEWSLETTERS
Receive the latest Investigations updates in your inbox

Email   Sign up

Privacy policy | More Newsletters


NEW YORK LIVE
WEEKDAYS 11:30 AM

Investigations

I-Team: More NYPD Officers Say There's Proof of Quota-Driven Arrests

Quotas in the NYPD still exist for arrests and summonses in violation of a 2010 state ban on the practice, current on-the-job officers tell the I-Team, despite Police Commissioner Bill Bratton's repeated insistence that there are no quotas. Sarah Wallace reports. (Published Friday, March 1, 2016)

Top NYPD officials have repeatedly denied the I-Team's requests for comments, but NYPD Commissioner Bill Bratton responded to Raymond's claims in February by calling them "bulls---."

The department and Bratton have said that policies are focused on the quality of arrests and citations, not the quantity.

In a statement Thursday, the NYPD added "There are no numerical quotas in the NYPD. However, we expect our members to do their jobs. Just like any other organization, there are performance standards through which employees are evaluated. Our officers and supervisors are evaluated according to how effectively and appropriately they address the conditions within their area of responsibility."

- **SUV Smashes Cars, Crashes Onto Sidewalk in Wild Chase**

The city has asked a federal judge to dismiss portions of the federal lawsuit, claiming the officers haven't begun to prove a case for either quotas or racial discrimination. A decision could come at any time.

*Get the latest from NBC 4 New York anywhere, anytime*


**Contact Sarah Wallace**
Twitter, Facebook, Email


**Download the App**
Available for IOS and Android

**Follow NBC New York**

**You May Like**                                   Promoted Links by Taboola

Keystone Shows The Value Of The SaaS Model
Microsoft

See How Craftsmanship is Instilled in the Next Generation
James Hardie

Dollar Shave Club $5 Starter Sets Have You Covered for Less.
Dollar Shave Club

Red Dress Takes Heat Amid Golden Globes All-Black Dress Code

Swatting victim family lawyer: 'Swatting is not new,' officers should have been prepared
NBC News

President of Church of Latter Day Saints dead at 90
NBC News

SPONSORED LINKS                    MORE FROM NBC New York

Home   News   Weather   Investigations   Entertainment

- Here's Why Your Commercial Apps Should Be In The Cloud (Microsoft)
- Enterprise-Class Security & Scalability Without VPN Complexity & E... (TeamViewer)
- Don't Wait: Shop The Best Tommy Hilfiger Winter Deals Before The... (Macy's)
- Teen With College Scholarship Critically Hurt in NYC Deli Shooting: Family
- Discovery Channel Tells Employees It Is Moving Headquarters to NYC
- Trump Endorses Return of Earmarks as House GOP Weighs Change
- NY Assemblywoman Stole Sandy Money from FEMA, Tried to Cover it Up: Prose...
- Trump Likely Can't Refuse Mueller Subpoena to Answer Questions

Promoted Links by Taboola

**Leave Comments**







**Free Case Evaluation (http://www.thesandersfirmpc.com/free-case-evaluation/)**   212-652-2782 (tel:2126522782)



(http://www.thesandersfirmpc.com/)

BLOG



# NYPD Cop Says 'Quotas Are Revenue Driven'

Posted on August 15, 2016 (http://www.thesandersfirmpc.com/nypd-cop-says-quotas-are-revenue-driven/) by Eric Sanders (http://www.thesandersfirmpc.com/author/thesandersfirmpc/)

## FOR IMMEDIATE RELEASE

NEW YORK, August 15, 2016 – New York Civil Rights Attorney Eric Sanders, Esq., of The Sanders Firm, P.C., representing NYPD Police Officer Michele Hernandez sues 'Performance Goals aka Quotas Are Revenue Driven'

According to the Notice of Claim, NYPD Police Officer Michele Hernandez alleges from March 2003 through present while assigned to various NYPD precincts within Bronx County, she and other similarly situated police officers are being forced to follow the ticket and arrest quota systems aka performance goals in violation of their constitutional rights which are implemented to illegally tax constituents, raising revenues, advancing the

political agendas of government officials and Department executive management who are rewarded with overtime, compensatory time, promotions and other job benefits for enforcing the ticket and arrest quota systems.

Ms. Hernandez further alleges the ticket and quota systems aka performance goals disparately impact African-American, Hispanics and other persons of color who travel through, work and reside in Bronx County.

Despite the so-called high profile 'Ticket-Fixing' Scandal allegedly investigated by the NYPD Internal Affairs Bureau and the Bronx County District Attorney's Office, the practice of 'fixing' tickets still continues to this date, according to the Notice of Claim. The so-called investigation primarily focused upon police officers, sergeants and lieutenants. They were subjected to arrest, suspensions and terminations. Meanwhile, Ms. Hernandez claims, executive management (Captains and above) were largely absolved although the 'fixing' couldn't have occurred without their 'explicit' approval.

Ms. Hernandez claims on March 11, 2014, she initiated a legal car stop of New York City Councilwoman Vanessa L. Gibson in Bronx County who she observed talking on her cellular telephone without a hands free device. While stopped, she asked NYC Councilwoman Gibson if the 'CO' was on the cellular telephone. NYC Councilwoman Gibson handed her the cellular telephone, former commanding officer Kevin Catalina then begged her, "Please don't write the summons because she meets with the Mayor and Police Commissioner monthly in her role with the Public Safety Committee." NYC Councilwoman Gibson was immediately released and the summons wasn't issued. The next day, Summons No.: AAW9075382 was 'VOIDED' by the Training Sergeant. The 'VOIDED' summons was endorsed by Catalina and sent through channels. Unbeknownst to them, Ms. Hernandez kept a copy of the summons because she knew it was wrong but, she had nowhere to file her complaint.

Several months later, Ms. Hernandez was transferred to the 49th Precinct and eventually under commanding officer Keith Walton where she was warned by other supervisors and police officers that no one wants to work with her. Prior to her transfer, she was accused of being a 'rat' by Lieutenant Wilson, 44th Precinct, according to the Notice of Claim.

Ms. Hernandez claims 49th Precinct personnel engages in the same sort of ticket and arrest quota systems along with 'fixing.' Under commanding officer Keith Walton, Ms. Hernandez claims she's still being subjected to unfair assignments and discipline for 'passively' rejecting the ticket and arrest quota systems. Since Ms. Hernandez's transfer into the 49th Precinct, on numerous occasions her vehicle has been damaged. Ms. Hernandez claims she and other similarly situated police officers are afraid to report these acts of corruption because other police officers who have complained have been subjected to suspensions, transfers and terminations.

"In other jurisdictions, the DOJ have determined similar 'performance goals' are purely revenue driven which have a disparate impact upon persons of color. Unfortunately, the Courts and elected officials have helped to perpetuate this revenue building here. It's time for the DOJ to hold NYPD managers and elected officials legally accountable and end these practices once and for all," says Eric Sanders.

Ms. Hernandez filed her $75 Million Dollar Notice of Claim with the New York City Comptroller's Office on August 11, 2016, Claim No.: 2016PI023768.

# ABOUT THE SANDERS FIRM, P.C.

The Sanders Firm, P.C. (http://www.thesandersfirmpc.com/)offers those in the New York City area legal services related and connected to civil rights (http://www.thesandersfirmpc.com/practice-areas/civil-rights-2/), civil service rights (http://www.thesandersfirmpc.com/practice-areas/civil-service-law-2/), criminal law (http://www.thesandersfirmpc.com/practice-areas/criminal-law/) and discrimination

(http://www.thesandersfirmpc.com/practice-areas/discrimination/). We firmly believe in everyone's individual rights that are described and guaranteed by the Constitution of the United States of America. We understand that our freedoms and liberties are sacrosanct and that they have been won in many and various hard-fought battles. We are committed in every way to protecting your civil rights. The Sanders Firm, P.C. is your voice for justice!

# CONTACT

Eric Sanders, Esq.
The Sanders Firm, P.C.
Business Phone: 212-808-6515

Read Notice of Claim (https://www.scribd.com/document/321253704/In-the-Matter-of-the-Claim-of-Michele-Hernandez-v-City-of-New-York-et-al)

Read New York Daily News  (http://www.nydailynews.com/new-york/nypd-claims-ordered-nix-ticket-city-pol-article-1.2751162)

     

**Related**

(http://www.thesandersfirmpc.com/nypd-cop-sues-retaliated-against-for-rebuffing-performance-goals-aka-quotas/)
NYPD Cop Sues: Retaliated Against For Rebuffing Performance Goals aka 'Quotas' (http://www.thesandersfirmpc.com/nypd-cop-sues-retaliated-against-for-rebuffing-performance-goals-aka-quotas/)
December 14, 2016
In "Abuse of State Power"

(http://www.thesandersfirmpc.com/nypd-cop-bronx-da-retaliating-against-me-for-exposing-corruption/)
NYPD Cop: Bronx DA Retaliating Against Me For Exposing Corruption (http://www.thesandersfirmpc.com/nypd-cop-bronx-da-retaliating-against-me-for-exposing-corruption/)
May 1, 2017
In "Abuse of State Power"



(http://www.thesandersfirmpc.com/ex-nypd-highway-supervisor-refuses-to-discriminate-against-black-cop-files-lawsuit/)
Ex-NYPD Highway Supervisor Refuses to Discriminate Against Black Cop, Files Lawsuit (http://www.thesandersfirmpc.com/ex-nypd-highway-supervisor-refuses-to-discriminate-against-black-cop-files-lawsuit/)
June 23, 2017
In "Abuse of State Power"

## SEARCH

Search …

## CATEGORIES

Select Category ▼

## RECENT POSTS

- Hollywood, Hip Hop and the Casting Couch [Street Soldiers] (http://www.thesandersfirmpc.com/hollywood-hip-hop-and-the-casting-couch-street-soldiers-2/)
- Hollywood, Hip Hop and the Casting Couch [Street Soldiers] (http://www.thesandersfirmpc.com/hollywood-hip-hop-and-the-casting-couch-street-soldiers/)
- Embattled NYPD Det. Alleges Race Discrimination (http://www.thesandersfirmpc.com/embattled-nypd-det-alleges-race-discrimination/)
- Bronx DA Dismissal of Criminal Charges Against Pedro Hernandez (http://www.thesandersfirmpc.com/bronx-da-dismissal-of-criminal-charges-against-pedro-hernandez/)
- Embattled NYPD Det. Strikes Back Files $175 Mil. Notice to Sue (http://www.thesandersfirmpc.com/embattled-nypd-det-strikes-back-files-175-mil-notice-to-sue/)

## SUBSCRIBE TO NEWSLETTER

Email Address                    SUBSCRIBE

## CONTACT US

Your Name*

Phone

Email*

Message*

New York Civil Liberties
Union

# MATTHEWS V. CITY OF NEW YORK (CHALLENGING PUNITIVE QUOTA SYSTEM IN 42ND NYPD PRECINCT)

This lawsuit challenges the repeated retaliation against a veteran police officer who has disclosed the use of an illegal quota system for arrests, summonses and stop-and-frisk encounters in the 42nd Precinct in the Bronx. The lawsuit, filed on Feb. 23, 2012 in U.S. District Court for the Southern District of New York, maintains that supervisors in the 42nd precinct have developed a detailed quota system, which includes regular color-coded computer reports used to track compliance with quotas. Officers who fail to meet the quotas are highlighted in red ink on the reports and subject to a wide range of retaliation. Recognizing that the quota system is illegal and abusive, Officer Craig Matthews repeatedly reported it to the precinct's commanding officers. In retaliation, he has been given punitive assignments, denied overtime and leave, separated from his longtime partner, given poor evaluations, and subjected to constant harassment and threats.

The lawsuit, filed on Officer Matthews' behalf in Manhattan federal court, asks the court to declare that the NYPD's retaliatory actions violate the officer's free speech rights under the First Amendment and the New York Constitution. The 42nd Precinct's quota system reflects a wider problem within the NYPD. For years, the Department has been mired in scandals about its use of quotas that lead to unjustified stops and arrests of innocent people. Starting in May 2010, the Village Voice ran a series of articles exposing a quota system in the 81st Precinct in Brooklyn as revealed by audio tapes secretly made by Officer Adrian Schoolcraft. A police officer in Queens recently admitted that the use of enforcement quotas led officers to plant cocaine on innocent people in order to boost arrest numbers.

In August 2010, then-Gov. David Paterson signed legislation that expanded protections for police officers under the state's anti-quota statute to ban retaliation against officers for not meeting quotas for tickets, summonses, arrests, and stop-and-frisk encounters. Previously, the quota law only covered traffic violations. Officer Matthews, a 14-year veteran of the NYPD, consistently received positive annual reviews before the retaliation started against him. For example, his 2004 review stated that he "has the highest level of integrity and displays a great sense of morals." As a result of his principled stand, Officer Matthews has gone from being a respect member of the precinct to being the target of abuse from his supervisors.

In April 2012, the district court granted the city's motion to dismiss the case. Plaintiffs appealed the ruling to the U.S. Court of Appeals for the Second Circuit. Oral argument was held in October 2012.

S.D.N.Y., Index No. 12 CIV 1354 (direct)

## Court Filings

- The Petition (PDF) (https://www.nyclu.org/sites/default/files/releases/42%2520Pct%2520Quota%2520 23-12.pdf)
- 42nd Precinct Quota Report (PDF)(Officers' names redacted) (https://www.nyclu.org/sites/default/files/releases/2011%25201st%2520Qtr%2520F
- Order Granting Motion to Dismiss (PDF) (https://www.nyclu.org/sites/default/files/Decision-Order%20Granting%20Motion%20to%20Dismiss%204-12-12%20%2800006705%29.pdf)

## ATTORNEY(S)

Kate Doniger, Holly Mowforth, and Jacob Tracer, who are students enrolled in the New York University School of Law's Civil Rights Clinic, are co-counsel on the case.

---

**COURT**

Federal

**STATUS**

Closed

---